BROWN UNIVERSITY in Providence in the State of   :
Rhode Island and Providence Plantations,   :
  :
        Plaintiff,   :
  :
v.   :      ACTION NO. 4:10CV167
  :
DONALD R. THARPE   :
And TONI M. THARPE,   :
  :
        Defendants.   :

## OPINION AND ORDER

In this case, Brown University ("Brown") invokes the equitable remedy of detinue to recover a Tiffany presentation sword ("Tiffany Sword" or the "Sword") it claims was stolen from its collection more than 30 years ago. The Defendants, Donald R. Tharpe and Toni M. Tharpe (for simplicity, hereafter "Tharpe"), acquired the Sword from a collector in 1992, and oppose Brown's claim on the grounds that they are bona fide purchasers. Tharpe also claims Brown's long delay in asserting its rights should bar its recovery of the Sword under the doctrine of laches.

Following a bench trial, and for the reasons set forth in detail below, the Court FINDS that the Tiffany Sword was stolen from Brown prior to 1977. As a result, Tharpe's claim to bona fide purchaser status would not defeat the University's detinue action. In addition, although Brown could have pursued recovery with greater zeal, its delay in filing this action was primarily due to the deliberate efforts of Tharpe's predecessor, who attempted to thwart its recovery when

1

the Sword first surfaced in 1992. Moreover, Tharpe cannot demonstrate any prejudice resulting from Brown's delay, and as a result has not proved the affirmative defense of laches.

## I.     FINDINGS OF FACT

The parties stipulated to most of the relevant history and presented testimony by deposition and two witnesses at trial. In addition, the Court examined the Sword, its presentation box, documents of title, and related articles and correspondence. These exhibits, the parties' stipulations, and testimony at trial established the following facts.

In May 1863, 50 prominent citizens of New York presented a Tiffany Silver Presentation Sword to Colonel Rush C. Hawkins ("Col. Hawkins"), to recognize his service to the country during the first two years of the Civil War. The Tiffany Sword, along with an ornamental scabbard, was presented to Col. Hawkins in a wooden presentation box lined with blue velvet. The box had Col. Hawkins' initials on it, as did the guard of the Tiffany Sword. The blade of the Sword is inscribed with the names of battles and engagements of the 9th New York Volunteers, known as the Hawkins' Zouaves, the regiment led by Col. Hawkins. Carved into the grip of the Sword is the figure of a Zouave soldier in uniform, standing watch. The scabbard is also inscribed:

> "Presented to
> COL. RUSH C. HAWKINS
> of Hawkins' Zouaves,
> for his gallantry and devotion to his country,
> by fifty of his fellow-citizens of New York,
> May, 1863"

Following his military service, Col. Hawkins returned to the practice of law in New York. His financial success, and a particular interest, led him to accumulate one of the world's largest private collections of incunabula, or early examples of printed books. In 1903, Col. Hawkins created a Memorial Corporation, to honor the memory of his late wife, Annmary

Brown, a descendent of the founders of Brown University. The corporate charter authorized the Memorial to "maintain[ ] and preserve[ ] a museum collection for the benefit of the public." (Trial Ex. 8). In 1907 Col. Hawkins endowed the Annmary Brown Memorial with his extensive collection of incunabula, as well as paintings, artifacts of his Civil War service, and other items collected during his career. Included in the endowment were the Tiffany Sword and another sword presented to Col. Hawkins by his troops. The second sword was presented to Col. Hawkins in 1862 by the sergeants and enlisted men of the regiment following an engagement in North Carolina (the "Roanoke Island Sword"). Under the terms of the deed of indenture conveying these items, all of the collection was to be kept in the Memorial building and never removed except for the use of scholars under the immediate supervision of the collection's curator, or as necessary for "repair or restoration." (Trial Ex. 9).

Both swords and the remainder of Annmary Brown Memorial's collection were conveyed to Brown by a decree of the Superior Court of Rhode Island in 1948. Like the original indenture, the decree required that "the collections shall forever remain deposited" in the Memorial building. Brown was directed to comply, as much as it was able, with Col. Hawkins' desire that "the building and collections be maintained and preserved for the benefit of the public." (Trial Ex. 10). From 1948 until 1971, both swords were kept in the Memorial, a building on the grounds of Brown University. In 1971, John Stanley ("Stanley"), went to work for Brown as an administrator with the John Hay Library. In this capacity, Stanley first viewed both swords which were then kept in separate storages cases atop a cabinet in the painting storage room in the Memorial. Between 1971 and 1974, Stanley saw the Tiffany Sword three or four times. He also saw the Sword's presentation box on other occasions when he did not open the box to view or show the Tiffany Sword.

The Annmary Brown Memorial was closed for budget reasons between 1975 and 1977. During this time various people had access to the building including campus security, janitorial and maintenance staff. The boilers for the Memorial which required regular maintenance were in a room immediately adjacent to the painting storage room.

In 1977 the Memorial reopened under the supervision of Samuel Hough. Hough organized an exhibition of the Memorial's artifacts to mark the reopening, and when Stanley noticed that neither of the two swords were among the artifacts displayed, he inquired of Hough why they were omitted. Stanley took Hough to the painting storage room where the two men discovered both swords missing. Both the case for the Roanoke Island Sword and the presentation box for the Tiffany Sword were still on the cabinet where they had been. On opening the presentation box, however, the ornamental scabbard and Tiffany Sword, which fit precisely in a shaped depression in the velvet lining, were missing. Also missing was the Roanoke Island Sword and one of its two scabbards. Other items were also missing, including two silver candlesticks, a silver soup tureen, serving pieces and an ivory inlaid box. Wrappings from some of these other items were found in disarray. Hough reported the missing artifacts to the University Librarian in a written memo dated April 22, 1977, but the University made no report of the loss to authorities. The University was self-insured for theft losses, and Stanley testified that reporting the loss might discourage other donors from loaning artifacts to the school.

In January 1979, an antiques dealer named George Lower purchased the Tiffany Sword and ornamental scabbard from another collector, David K. Grossman, for $6,250.00. At the time the Sword was in poor condition with the scabbard dented such that the Sword could barely be removed from it. The blade of the Sword had also pitted badly. George Lower had located the

Sword with the assistance of Dennis Lowe, who was described by the parties as a "picker." After restoring the Sword, Lower traded it later that same year to another collector named Robert Harper ("Harper").

Harper kept the Sword from 1979 until 1992. He occasionally took it to shows in Gettysburg, Pennsylvania and Baltimore, Maryland, but otherwise kept it in the den of his home in his private collection. Tharpe first saw the Tiffany Sword in the 1980s at a gathering of arms collectors in Gettysburg, Pennsylvania. An avid collector himself, Tharpe expressed interest in buying the Sword on multiple occasions, but Harper told him it was not for sale. Eventually, Harper agreed that if he ever did sell the Tiffany Sword, Tharpe would receive a right of first refusal.

In 1991, Donald Troiani ("Troiani"), a military and historical artist who had a connection to Brown, saw the Tiffany Sword at a show in Baltimore where Harper had it displayed. Troiani was aware that the Sword was missing from Brown and telephoned a Brown librarian, Catherine Denning, to advise that Harper had it. Denning passed this information on to Stanley in the form of a phone message reflecting the source of the information (Troiani) and Harper's name and mailing address. Troiani related that he did not want his name used in connection with the report. Troiani also advised that he had learned from a friend that Harper acquired the Sword from George Lower six or seven years earlier. Stanley advised Brown's general counsel.

In September 1991, Brown retained attorney Jeffrey Michaelson ("Michaelson") to pursue Troiani's tip that the Sword was with Harper. Michaelson wrote Harper directly to request an opportunity to inspect the Sword. Michaelson's initial letter to Harper described the Sword in detail, including accurately quoting word-for-word the inscription on the ornamental scabbard. Michaelson's 1991 letter to Harper stated that the Sword had been stolen from Brown

"approximately ten years ago." (Trial Ex. 17). Harper hired attorney Steven McArdle ("McArdle") to represent him in the matter and McArdle wrote to request additional information describing the Sword, as well as details concerning Brown's ownership and the date it was discovered stolen. In a second and third exchange of correspondence Michaelson provided additional details, including news articles contemporaneous with the establishment of the Memorial, and book excerpts describing the Tiffany Sword in greater detail. These materials included a detailed description of the Sword, which included the carved depiction on the grip of a Zouave soldier in uniform, the names of the battles engraved on the blade, and the figure of Medusa on the band of the scabbard. These details match exactly the easily-observable features of the Tiffany Sword. Michaelson also revised his earlier estimate of the time the Sword was stolen, acknowledging some uncertainty, but stating it was believed to be 10 – 12 years earlier. Michaelson again requested an opportunity to inspect the Sword.

Notwithstanding the detailed description, and the acknowledged uncertainty concerning the date of loss, in March 1992, Harper's lawyer, McArdle, wrote Michaelson to state that Harper could "document his ownership and other persons' ownership . . . well beyond the time the Sword that you are referring to was stolen." As a result, Harper refused to provide the Sword for inspection.

Harper's statement through his attorney, McArdle, was misleading.[1] Harper could not document his ownership, or the ownership of others, any earlier than 1979, when he acquired it from George Lower. Harper acquired the Sword in a barter transaction which was not documented, but Grossman had acquired the Sword earlier that year as evidenced by a dated bill

---

[1] McArdle testified that he personally had never seen the Sword or a photograph of the Sword. He also produced a contemporaneous letter to his client requesting that Harper put together a chronology of ownership, but his file contained no recorded evidence that Harper did so, and McArdle had no independent memory of what Harper told him concerning prior owners.

of sale, and Harper had no information concerning how long Grossman had owned the Sword. Grossman related only that he had acquired it from "an elderly couple in New England." Grossman died in 1983.

At the same time Harper's attorney was responding to Brown's inquiries about the missing Tiffany Sword, Tharpe again inquired about buying it. This time, Harper expressed interest in selling but told Tharpe he could not sell because someone had "made a claim" which his lawyer was trying to resolve. In July 1992, at a large antique arms show in Gettysburg, Pennsylvania, Tharpe saw Harper again. At this meeting Harper advised Tharpe that the "claim" had been cleared and his lawyer advised him that he could now sell the Sword. Tharpe did not inquire how the claim was cleared, who had made the claim, or even what kind of claim had been asserted. He paid Harper's company, Cary Station Antiques, $35,000.00 for the Tiffany Sword.

Although Harper testified that he thought he had provided all of his correspondence with Brown's attorney to Tharpe at the time of the purchase, Tharpe denied this. The Court accepts Tharpe's explicit recollection over Harper's vague one, and finds that Tharpe did not have immediate access to the Michaelson letters and their detailed description of the Tiffany Sword at the time he acquired the Sword in 1992. Nevertheless, by March 1994 Tharpe had learned of Brown's claim when the second Roanoke Island Sword surfaced at an auction house in Massachusetts. Brown successfully sued to recover the Roanoke Island Sword and Tharpe learned of Brown's claim and of the second missing Sword through a 1994 article in the *Maine Antique Digest*.[2] (Trial Ex. 29).

---

[2] For the details on the Roanoke Island Sword and an interesting history of Col. Hawkins and the Hawkins' Zouaves, see Brown University v. Kaminski, No. 924290 (unpublished), 1994 WL 879757 (Mass. Super. June 23, 1994).

On hearing of Brown's claim, Tharpe engaged attorney Fred Edmonds to investigate "problems encountered concerning the ownership of the Rush Hawkins Sword." Edmonds wrote McArdle (Harper's lawyer) in April 1994 stating that he had been engaged by Tharpe, but had "no intention of contacting Brown University." The same letter stated that Edmonds was "only interested in gaining enough helpful information so that a legal chain of title into Tharpe may be established." (Trial Ex. 30). McArdle wrote back promptly conveying all of the information he had received from Brown, including the letters from Brown's attorney, Michaelson, as well as all of the supporting documentation describing the Tiffany Sword. Some of this material was already in Edmonds' possession because he quotes from the Michaelson correspondence when first writing to McArdle.

In the ensuing years Tharpe did not contact Brown, but continued to maintain the Sword as part of his extensive private collection. Indeed, Tharpe is acknowledged to be one of the preeminent collectors of Civil War and other early American presentation swords in the world. He occasionally loaned swords, including the Tiffany Sword, for display. The Tiffany Sword was first displayed in Newport News, Virginia at Lee Hall Mansion between 1998 and 2002. During that time, a Civil War historian from North Carolina, Dennis Schurr, who knew of Brown's claim as a result of his research, learned that the Tiffany Sword was at Lee Hall and inquired of the museum who had loaned it. The Lee Hall curator indicated that he knew the name of the lender (Tharpe), but that he could not release it without permission.

Notwithstanding Schurr's inability to identify Tharpe as the owner of the Sword, he continued to instigate Brown's general counsel to pursue its recovery through Lee Hall Mansion. Schurr periodically called and wrote to Brown's general counsel suggesting that they pursue recovery through Lee Hall, where the curator knew Tharpe's identity and knew that he still

possessed the Tiffany Sword. Despite Schurr's insistence, Brown took no action until 2010 when it received new information that the Sword was again on display at Lee Hall. This time Schurr had obtained a photograph of the Sword on display at Lee Hall. Tharpe had again loaned the Sword to Lee Hall, but ended the loan agreement early and removed the Sword in December 2010. Stanley reviewed the photographs and confirmed they depicted the Tiffany Sword. Shortly thereafter, Brown filed suit against Lee Hall to recover the Sword. On initiating the action, Tharpe was identified, made a party and served.

Following service, Tharpe initially defended the claim arguing that the sword in his possession was not Brown's missing Tiffany Sword. During a video-taped inspection of the Sword, where the parties attempted to place it in the fitted, velvet lined presentation box, Tharpe noted problems with the fit and suggested the Sword he possessed would have left different marks on the lining. Eventually, however, he agreed that the Tiffany Sword he purchased from Harper in 1992 had once belonged to the Annmary Brown Memorial, that it fit precisely in the contoured box which remained there, and that Brown had at one time been its rightful owner. Despite demand, Tharpe refused to return the Sword.

## II.    CONCLUSIONS OF LAW

Brown brings this detinue action to recover possession of the Tiffany Sword. The purpose of a detinue action is "the recovery of specific personal property." MacPherson v. Green, 197 Va. 27, 32, 87 S.E.2d 785, 789 (1955). In Virginia, to maintain an action for detinue: "(1) The plaintiff must have property in the thing sought to be recovered; (2) he must have the right to its immediate possession; (3) it must be capable of identification; (4) the property must be of some value, and (5) the defendant must have had possession at some time prior to the institution of the action." Vicars v. Atl. Disc. Co., 205 Va. 934, 938, 140 S.E.2d 667, 670 (1965); see also York v.

Jones, 717 F. Supp. 421, 427 (E.D. Va. 1989). Brown and Tharpe have stipulated to facts establishing four of the five elements of detinue. As a result, there is no dispute that Brown once owned the Tiffany Sword, that it is capable of identification, and is, in fact, the same sword purchased by Tharpe in 1992. The parties also agree the Sword has value and was in Tharpe's possession at some time prior to the action. The only issue in dispute is whether Brown has the right to immediate possession of the Sword.

To prove it has the right to immediate possession, Brown must show it has a superior claim to the Sword by proving it was "unlawfully divested" of possession of the Sword at a date prior to Tharpe's possession. See Vicars, 205 Va. at 940, 140 S.E.2d at 672. Thus the key fact to be resolved by the trial is what happened to the Sword when it was removed from the Memorial sometime before 1977. Because there is no question the Sword was removed during this time, the dispositive issue is whether its removal was unlawful such that the person removing it conveyed no title to successors, or whether it was due to negligence, mistake, or fraud such that a bona fide purchaser with no notice of the infirmity might take clear title. See Oberdorfer v. Meyer, 88 Va. 384, 386, 13 S.E. 756, 756-57 (1891) (bona fide purchaser can take good title from seller with voidable title); Toyota Motor Credit Corp. v. C.L. Hyman Auto Wholesale, Inc., 256 Va. 243, 247, 506 S.E.2d 14, 16 (1998) (thief can never pass title superior to true owner's).

Both parties attempt to shift the burden of proof on this point to the other party. Brown posits that because the Memorial's indenture restricted removal of all artifacts, except as necessary for repair or restoration, the Sword's disappearance is ipso facto proof that it was removed unlawfully – that is without Brown's authority. Brown argues that this proves it was "unlawfully divested" of title and shifts the burden back to Tharpe to prove his claim to superior title by establishing that some possessor after Brown had acquired at least voidable title.

10

Accordingly, Brown asserts that it need only prove the Sword was actually stolen if the Court finds that Tharpe first establishes voidable title in a predecessor and that he is a bona fide purchaser. Tharpe argues, on the other hand, that his possession of the Sword at the institution of this action creates a rebuttable presumption that he is rightly in possession, which requires Brown to prove the Sword was actually stolen and not merely removed without authority. See Willcox v. Stroup, 467 F.3d 409, 412 (4th Cir. 2006); Maine v. Adams, 277 Va. 230, 238-39, 672 S.E.2d 862, 867 (2009). He argues that such voidable title might arise if the Sword were lost due to negligence, carelessness or fraud and therefore Brown is required to prove the circumstances of the Sword's loss in order to exclude these possibilities rather than simply prove that the Sword was removed contrary to the terms of the Indenture.

After considering all of the parties' arguments, the Court finds that Brown, as the party seeking relief in detinue, bears the burden to prove its superior title. The Court also finds that Brown's evidence, including the terms of the Indenture, coupled with the facts adduced at trial regarding the Sword's disappearance, proved by a preponderance of the evidence that the Sword was stolen.

A.    **The Tiffany Sword was stolen from the Memorial sometime between 1975 and 1977.**

The evidence adduced at trial leads the Court to conclude that the Tiffany Sword was stolen from the Memorial while the Memorial building was closed from 1975 to 1977. It is uncontroverted that the Tiffany Sword was in the Memorial in 1971. The Sword was reflected on a typewritten card identifying both swords which were part of the Memorial's holdings (Trial Ex. 15) and Stanley testified that he conducted a thorough review of the Memorial's collections during his first six months at Brown in 1971. He observed both the Tiffany and Roanoke Island

swords as well as several other items held in the painting storage room. Stanley testified that the swords were kept in presentation boxes atop cabinets in the painting storage room. The Tiffany Sword had a parchment testimonial outside of its presentation box. Stanley withdrew the Tiffany Sword from the scabbard on at least two occasions and viewed the scabbard on a few other occasions from 1971 to 1974. Stanley last viewed the Tiffany Sword inside its presentation box in 1974 before the Memorial was closed. He testified that the cabinets, upon which the presentation boxes rested, contained other items such as dinnerware, flatware, and a silver tureen which were wrapped with a transparent wrapping to prevent dust damage. Important to the issue of whether the Tiffany Sword was stolen is Stanley's testimony that each time he went to the painting storage room these items remained wrapped and in the same place.

This was not the case in 1977 when the Memorial reopened and held an exhibit showcasing its artifacts. After realizing that the swords were not displayed, Stanley inquired of Hough why they were not included in the exhibit. Hough informed Stanley that he had never seen the swords which prompted Stanley to ask Hough if they could go down to the painting storage room where he had last seen the swords. Upon arriving in the painting storage room, everything appeared to be in the same location. The presentation boxes remained closed on top of the cabinets as they had before the Memorial closed and the parchment testimonial was still adjacent to the Tiffany Sword presentation box. However, after Stanley and Hough took down the presentation boxes and opened them, they found both swords missing. The Tiffany Sword box was missing the Sword and scabbard. The Roanoke Island case which had previously held the sword and two scabbards was missing the sword and a field scabbard but a more ornate ceremonial scabbard remained in the case.

In addition, Stanley noticed that several items which had previously been on the shelves and in the cabinets were also missing. The wrapping from these items and several others had been removed and scattered about. Some of the missing items which Stanley could remember included: the Tiffany Sword and scabbard, the Roanoke Island Sword and one its scabbards, silver candlesticks, a Venetian silver tureen, several serving dishes, and an ornamental box with ivory inlay. Hough documented the missing items in his contemporaneous memo to the Provost.

The Court finds particularly relevant that the presentation boxes left in the Memorial building were in the same location as when Stanley had last seen them before the Memorial closed. Had the two swords been removed for repair or restoration and then negligently or mistakenly lost as Tharpe suggests, it is highly unlikely that their protective cases would have been left behind. Rather, it seems much more likely that the Tiffany Sword would have been taken and transported in its presentation box in which it fit precisely and securely. Additionally, the fact that several other items were missing and unwrapped, with the packaging scattered, strongly suggests theft rather than removal for repair or some legitimate purpose. Also, the missing items were all intrinsically valuable – two ornate swords removed from their velvet-lined cases, along with silver candlesticks and serving pieces. These circumstances of the Swords' disappearance strongly suggest they were unlawfully removed by someone intending to permanently deprive Brown of its right to possession.

Tharpe argues that all of these facts are still insufficient to prove by a preponderance of the evidence that the Sword was stolen. He asserts that the Sword's disappearance is as likely the result of its having been removed for a legitimate purpose, and then forgotten. Because the actual time and circumstances of its removal are not plain, Tharpe contends any conclusion that

the Sword was stolen can be based only on speculation. He relies heavily on Maine v. Adams, 277 Va. 230, 672 S.E.2d 862 (2009) to support this argument. But Adams is easily distinguished.

Adams involved a rare copy of the Declaration of Independence, printed in July 1776 and discovered in 1995 by descendants of a former town clerk for Wiscasset, Maine. After the document, commonly referred to as a "broadside," was sold to a collector, the state of Maine alleged the item was a public record that had been stolen or converted by the town clerk. Id. at 233-35, 672 S.E.2d at 863-65. The collector, Adams, brought suit to quiet title. The evidence at trial established that after the Second Continental Congress approved the Declaration of Independence, the Massachusetts Executive Council[3] issued an order requiring the Declaration to be printed and delivered to the ministers of all churches to be read aloud to the congregation. Id. at 233, 672 S.E.2d at 864. The order also required the town clerks to record the Declaration's text in their town record books "to remain as a perpetual Memorial thereof." Id. at 234, 672 S.E.2d at 864. Importantly, neither the order nor any other law directed the clerk regarding the proper disposition of the broadside after the Declaration was transcribed into the town record book. Id. The location of the broadside at issue in Adams remained unknown from its recordation in November 1776 until it was found over 200 years later in the attic of the former town clerk's daughter. Id. The State of Maine alleged that this evidence proved the broadside had been converted, or stolen, from the town of Wiscasset, Maine where the town clerk had worked and on that ground sought to recover the document from Adams. Id. at 242-43, 672 S.E.2d at 869.

The Supreme Court of Virginia rejected Maine's argument on two grounds. It first held that Maine failed to prove Wiscasset ever owned the broadside, noting that the broadside was not created by a public official and thus did not meet the definition of a public record. Id. at 241-42,

---

[3] In 1776, Massachusetts encompassed an area of land that today includes Maine.

672 S.E.2d at 868-69. The Court further found that, even assuming Maine had owned the broadside, the evidence did not support a theory of conversion, and the Court refused to speculate that "because the print was found in [the town clerk's daughter's] attic, [the town clerk] or a member of his family converted the print." Id. at 243, 672 S.E.2d at 869.

Although Adams has some parallel to the facts of this case, it is worth noting that the Supreme Court of Virginia affirmed the trial court's factual findings on both dispositive issues. Those facts were markedly different from the facts before this Court. Unlike in Adams, the evidence in this case – indeed the parties' stipulated facts – established unequivocally that Brown owned the Tiffany Sword. Not only did Brown own the Sword, it was bound both by the original indenture and a court decree to maintain and preserve it in the Memorial building. These documents strictly limited the legitimate reasons for removing the Sword from the Memorial building, and thus correspondingly limited any legitimate explanation for the Sword's disappearance. While this evidence alone may not be adequate to attribute the loss to a theft, when coupled with the testimony and documentary evidence of the Sword's disappearance, it is sufficient.

The essence of factfinding is to make reasonable inferences from the evidence produced. See Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995) (citing Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir. 1958)). This often requires the factfinder to evaluate the competing inferences from both circumstantial and direct evidence. Id. Ultimately, the factfinder must distinguish reasoned inference from conclusory speculation based upon the relative merit of these competing inferences. Id. Here, the direct evidence proves the Sword was in the Memorial in 1974, and gone by 1977. Brown claims the other evidence points to a theft, and the competing inference Tharpe offers is that Brown lost the Tiffany Sword, not due to the

agency of an unidentified thief, but due to its own carelessness, negligence, mistake or fraud. But as explanations for all the circumstances of the Sword's disappearance, Tharpe's competing inferences do not fit the facts shown by the evidence.

In addition to the limits imposed by the indenture and decree, the evidence at trial established that the Sword was regularly kept in a fitted case in a storage room along with other valuable artifacts. After a two year period, during which the Memorial building was not regularly staffed, the Sword along with other valuable items were discovered missing. Several people had access to the Memorial during this time but only the University President could authorize removal of a Memorial artifact. There is no recorded mention of the Sword's removal in the records which would have reflected it. The presentation box remained in the Memorial, as did packing materials from some of the other objects which had been left in disarray. All of the missing items were intrinsically valuable, whereas many other rare documents and books remained. Finally, the Sword surfaced in the possession of an antiques collector with no known connection to Brown. A second sword lost at the same time was also later acquired by an unrelated private collector.

Tharpe's competing inference, that the Sword may have been initially removed by someone with authority and then fraudulently, mistakenly or negligently lost, fails to account for several of these important facts. To begin with, it is undercut by Brown's policy regarding the Memorial's belongings. Stanley testified that, due to the terms of the Indenture, removal of any item from the Memorial required written permission from the University President. Before trial Stanley reviewed the Memorial's files and found that there had never been a request to remove the Sword from the Memorial.

In addition, had the items been legitimately removed for use by scholars or for restoration, they would not have been removed from their wrappings and protective cases with the latter left in the Memorial. Also, despite Tharpes' suggestion that the Memorial record keeping was inadequate, Stanley and Hough clearly documented the loss promptly after discovering it. Had the Sword and other objects been removed by someone connected with the Memorial – who might have had apparent authority to do so – that person would likely have learned of the reported loss when Hough documented it to the lead librarian in 1977.

Tharpe also suggests that Brown's actions after the Sword was discovered missing do not indicate it suspected a theft. In particular, Tharpe asserts that Brown's failure to report the theft to the authorities or conduct an extensive internal investigation suggests that Brown did not think the Sword was stolen. But, Stanley testified credibly that it was Brown's policy not to report missing items to authorities, because of its fear that publicizing its losses would adversely affect its relationship with potential donors. Stanley noted that Brown would instead keep quiet in the hopes that more information would surface. Stanley also testified that he communicated about the loss to individuals who might help recover the swords. Further, Brown's status as self-insured obviated any financial need to conduct a police investigation, because Brown would bear all losses. As such, Brown's decision not to report the theft or conduct a more detailed investigation does not suggest Brown did not think the Sword was stolen. Rather, it reflects Brown's desire (mistaken or not) to protect its reputation by limiting public awareness of the theft.

Finally, to the extent Brown was negligent in failing to secure the Sword against theft, or in immediately reporting the theft on discovery, its conduct would not bear on the issue of any title conveyed to Tharpe or his predecessors. This is because the person who stole the Sword

could not acquire nor convey good title to it, regardless of how easy or difficult the theft may have been to accomplish. The Sword was removed from its wooden case in secure archival storage and no person removing it could have believed he had a right to do so. The thief was therefore a stranger to the title, and had no title of his own to convey. "Any other result . . . 'would place a premium on the theft of personal property.'" Vicars, 205 Va. at 941, 140 S.E.2d at 673.

Although there may be many explanations for how both swords and the other artifacts came to be missing from the Memorial, all of the reasonable ones require intervention by an unauthorized third party who removed the items without permission, contrary to the terms of the indenture and decree conveying them to Brown. In addition, the circumstances of their disappearance in 1977, and their later recovery are inconsistent with any accidental or negligent loss. Accordingly, the Court finds that Brown has proven by a preponderance of the evidence that the Tiffany Sword was stolen by an unknown party prior to Tharpe's purchase from Harper.

**B.      Tharpe's claim to a bona fide purchaser status.**

Because Brown established that the Tiffany Sword was stolen, Tharpe's status as a bona fide purchaser would not defeat its claim. Generally, "[a] bona fide purchaser is one who purchases for a valuable consideration, paid or parted with, without notice of any suspicious circumstances to put him upon inquiry." 19 Michies Jur. Vendor and Purchaser § 126. Brown vigorously contests Tharpe's claim to bona fide purchaser status because he had explicit notice of a claim to the Sword in 1992 and a duty to investigate further before buying it from Harper. Indeed, Tharpe acknowledged that Harper had told him of a claim just months before his purchase. When Harper later advised that the claim had been resolved, Tharpe did not inquire who had made the claim, how it had been resolved, or even what type of claim had been

asserted. Nevertheless, in light of the Court's finding that the Sword was stolen, it is unnecessary to resolve this issue.

In Virginia, a purchaser generally acquires the same title which the transferor had. A bona fide purchaser can acquire good title from a transferor with voidable title. See Oberdorfer v. Meyer, 88 Va. 384, 386, 13 S.E. 756, 756-57 (1891). However, if the transferor has no title, he "cannot transfer title to a buyer, even a *bona fide* purchaser for value without notice." Toyota Motor Credit Corp. v. C.L. Hyman Auto Wholesale, Inc., 256 Va. 243, 247, 506 S.E.2d 14, 16 (1998) (citing First Nat'l Bank of Waynesboro v. Johnson, 183 Va. 227, 236, 31 S.E.2d 581, 585 (1944)). "Thus, a thief cannot pass title to stolen goods even to an innocent purchaser who pays for the stolen goods." Id. Because the Tiffany Sword was stolen from Brown, no owner subsequent to the thief obtained title superior to Brown's. Accordingly, although Tharpe may have purchased the Sword for value in good faith, he did not obtain good title to it.

C.   **Brown's claim is not barred by the doctrine of laches.**

Because Brown established that the Sword was stolen, it has a right to recover possession unless the doctrine of laches bars its claim.[4] See Willcox v. Stroup, 467 F.3d 409, 414 n.1 (4th Cir. 2006) (noting affirmative defenses to a detinue claim). After reviewing the evidence presented on laches, the Court concludes that Brown's claim is not barred.

Laches is an equitable defense, arising from a party's "neglect or failure to assert a known right or claim for an unexplained period of time under circumstances prejudicial to the adverse party." Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate Trust, 243

---

[4] Tharpe previously claimed Brown's claim was barred by a five-year statute of limitations applicable to actions in detinue. See Gwin v. Graves, 230 Va. 34, 38, 334 S.E.2d 294, 297 (1985). The limitation claim was based on the argument that Brown's 1992 letter to Harper's lawyer, McArdle, constituted a demand for the return of the Sword triggering a five-year limitation period. In a written opinion, the Court denied Tharpe's limitation claim holding that the correspondence from Brown to Harper and his attorney requested an opportunity to inspect, but did not demand return of the Sword. (ECF No. 66, p. 5).

Va. 53, 58, 413 S.E.2d 599, 602 (1992). "[N]o rigid rule can be laid down as to what delay will constitute laches; every suit must depend on its own circumstances." Puckett v. Jessee, 195 Va. 919, 930, 81 S.E.2d 425, 431(1954). Laches is an affirmative defense, and the burden is on the party asserting it to prove each element. Morris v. Mosby, 227 Va. 517, 521-22, 317 S.E.2d 493, 496 (1984).

In order to bar Brown's recovery on the basis of laches, Tharpe must prove that its delay in filing suit was unreasonable, and that he was prejudiced as a result. Riordan v. Hale, 215 Va. 638, 642, 212 S.E.2d 65, 68 (1975). The Supreme Court of Virginia has repeatedly held that prejudice to the adverse party is a necessary element of laches and in its absence the defense cannot be sustained. Masterson v. Board of Zoning Appeals, 233 Va. 37, 48, 353 S.E.2d 727, 735 (1987) (reversing trial court application of laches in part because the defendant showed no prejudice from plaintiff's 24-year delay filing suit); Stewart v. Lady, 251 Va. 106, 115, 465 S.E.2d 782, 787 (1996) (denying claim of laches "even though the complainants could have asserted their claims earlier, [because] their failure to do so did not prejudice the respondents . . .").

Tharpe's proof at trial failed to establish two elements of the doctrine of laches. First, Tharpe did not prove that Brown unreasonably delayed filing suit once it had knowledge of its right to do so. Second, even if Brown should have acted more promptly, Tharpe's evidence was insufficient to establish the resulting prejudice necessary to invoke the doctrine of laches.

**1.     Brown did not unreasonably delay filing suit.**

For Tharpe to establish that Brown unreasonably delayed pursuing the claim, he must first show that Brown had knowledge of its right to pursue one. Rutledge v. Rutledge, 204 Va. 522, 530, 132 S.E.2d 469, 475 (1963). On this element Tharpe primarily argues that Brown

unreasonably delayed when it failed to pursue recovery of the Sword following its receipt of Don Troiani's message that Harper had the Sword, and the later correspondence exchanged between Brown's lawyer, Michaelson, and Harper's attorney, McArdle. According to Tharpe, if Brown had filed suit against Harper promptly, it would have recovered the Sword in 1992 and thus Tharpe never would have acquired it in the first instance.

Tharpe's argument on this point overstates the information available to Brown, and minimizes the efforts made by Harper through his attorney to discourage Brown from recovering the Sword. At the time Brown made its initial investigation in 1991, it was based upon a telephone message from Don Troiani. Troiani was not an employee of Brown, but served in a volunteer capacity on a Brown-related board. In this way, he knew of Brown's interest in the Sword and reported his information to a Brown librarian, Catherine Denning. Importantly, Troiani did not have a photograph of the Sword or any other documentation establishing that the sword in Harper's possession was in fact Brown's missing object. Moreover, when imparting the message to Denning, Troiani stated that he wanted his name kept out of the report, thus minimizing the usefulness of his observations as the sole foundation for a civil suit.

Despite Troiani's reluctance, Brown did take affirmative steps to pursue his tip by retaining Attorney Michaelson and writing to Harper. Thereafter, Harper deliberately discouraged Brown's investigation. Though Harper's correspondence stops short of outright misrepresentation, it is plain to the Court, and likely to any layperson, that the information provided by Michaelson to Harper and his attorney was sufficient to establish that Harper had the same sword Brown claimed was stolen. But the information provided by Harper through McArdle was specifically calculated to convince the University otherwise.

It is likely that Harper knew he had the same Sword the moment he read Michaelson's first letter, which included the exact inscription on the scabbard of the Sword describing its presentation by 50 prominent citizens of New York, and the date May 1863. Instead of acknowledging the Sword was in his possession and seeking further evidence of Brown's claim to ownership, Harper instructed his attorney to advise Brown that Civil War leaders frequently received multiple presentation swords, thus encouraging Brown to submit a more detailed physical description of the object. While it is doubtful that any Civil War leader received two Tiffany presentation swords in the same month, both from a group of 50 prominent citizens of New York, Brown nonetheless complied with Harper's request and provided an even more detailed written description which included specifics of the engraving on the blade of the battles and engagements Col. Hawkins led, as well as the carved figure of a Zouave soldier on the grip, and the head of Medusa on the scabbard. All of these characteristics are easily observable on the Tiffany Sword. Faced with this irrefutable proof that the sword in his possession was described by the materials Brown provided, Harper continued to obfuscate, telling his lawyer to request additional detail as to when the Sword was discovered missing. After Michaelson acknowledged some uncertainty in the date of its theft, McArdle wrote to advise (incorrectly) that Harper could "document his ownership and other persons' ownership [to] well beyond the time the sword that you are referring to was stolen." In fact, Harper did not "document" his ownership at all. His barter transaction with Lower was not memorialized by any written bill of sale. The earliest date Harper could document anyone's possession was 1979, less than one year before the admittedly-estimated date of the loss provided by Brown's lawyer.

Importantly, though Harper and McArdle later claim they refused to cooperate with the inspection request because Brown had not established its ownership of the Sword, this is not

mentioned in McArdle's final correspondence. Instead, he wrote to advise that the two swords were not the same. Had Harper truly intended to rely on the absence of proof concerning Brown's ownership, he could easily have instructed his attorney to make that claim by admitting he had the Sword described and calling on Brown to more clearly document its claim to the object. Instead, the two advised Brown that Harper could trace his ownership and that of predecessors to "well beyond" the date Brown's sword went missing. Faced with this information, Brown did not act unreasonably by not immediately filing suit to recover the Sword. The last correspondence between Michaelson and McArdle was March 19, 1992 and Tharpe acquired the Sword on July 3, 1992, less than four months later. Given the information provided by McArdle in his correspondence to Michaelson, Brown's delay of less than four months is not sufficient evidence that it intended to abandon the claim.[5]

### 2. Tharpe was not prejudiced by any delay after 1992.

Because Brown's four-month delay prior to 1992 was not unreasonable, Tharpe attempted to show a longer pattern of delay which he claims prejudiced him. In arguing this element of laches, Tharpe first urges the Court to consider Brown's conduct beginning in the 1970s, when it failed to report the missing Sword as stolen. He also points out (correctly) that Brown's stewardship of both Hawkins swords and the other Memorial artifacts during that time had been less than careful. In short, Tharpe appears to suggest that Brown's sloppy record keeping and mistaken recovery strategy contributed to the Tiffany Sword being stolen, ultimately leading to his acquiring the Sword without good title. This is not the prejudice required to establish the affirmative defense of laches.

---

[5] Tharpe's attorney, Fred Edmonds, implicitly acknowledged the weakness of the abandonment theory when he wrote to McArdle in 1994 seeking to establish "a legal chain of title into Tharpe." (Trial Ex. 30).

While it is unfortunate that Tharpe acquired this, or any item, which had been stolen from the true owner, in order to prevent its return to the true owner under the doctrine of laches, he must show prejudice resulting from Brown's delay in enforcing its rights. Masterson, 233 Va. at 48, 353 S.E.2d at 735.

Brown was not definitively aware who had the Sword until 2010, when it received photographic evidence of its display at Lee Hall. This was partly due to Brown's failure to investigate other tips concerning the Sword's whereabouts, including the advice of historian Dennis Schurr in North Carolina. Schurr had remained convinced the Sword had been displayed at Lee Hall and that the Lee Hall curator knew Tharpe's identity and could be forced to disclose it through appropriate legal process. But it is undisputed that Tharpe himself contributed to this delay by instructing Lee Hall curators not to disclose his identity as the lender of the Tiffany Sword.[6] Tharpe also declined to contact Brown himself despite his clear understanding of its claim in 1994. When Brown received photographic proof that the Sword on display in 2010 was the missing Tiffany Sword, it filed suit promptly.

More importantly, there was no change in Tharpe's position after he acquired the Sword in 1992. As a result, he has shown no prejudice resulting from any delay thereafter. Tharpe testified at trial that the Tiffany Sword is in the same condition now that it was when he acquired it. He did not make any investment in having the Sword restored and thus he has made no change in his position since 1992, and has shown no prejudice from Brown's failure to seek its recovery during the time of his possession.

---

[6] At trial Tharpe's counsel suggested Brown could easily have discovered Tharpe's name by coming to the Newport News Gallery where the Sword was displayed – the Donald R. Tharpe Gallery of the Peninsula Campaign. But he did not contest Brown's evidence that the Tiffany Sword was loaned to the museum anonymously. Nor is there any evidence that Brown knew the Sword was on display there prior to its removal.

At trial Tharpe attempted to establish that his defense to the claim was hampered by the passage of time. Loss of witnesses or evidence can be used to demonstrate prejudice resulting from delay. Berglund Chevrolet, Inc. v. Landrum, 43 Va. App. 742, 755, 601 S.E.2d 693, 699 (2004). Tharpe introduced evidence that some of the people connected with Brown, or with the Tiffany Sword had passed away, thus precluding their testifying concerning the Sword's disappearance. In all, Tharpe identified three potential witnesses who had died, but only one of these deceased witnesses passed during the time Tharpe owned the Sword. David Grossman, the antiques dealer who sold to Lower, died in 1983. Thomas Adams, who was responsible for the Memorial collection prior to Hough, died in 1979. Because both these men died long before Tharpe acquired the Sword, and indeed before Brown even received the first suggestion that Harper or anyone else possessed it, their unavailability at trial did not result from any delay in Brown pursuing its rights. The third witness, Tharpe's original attorney Fred Edmonds, died in 2011, after the suit had been filed. If Edwards had information helpful to Tharpe's defense, it is likely Tharpe would have known about it prior to his passing. Thus, Tharpe could have preserved Edmonds' testimony had it been necessary to his defense. Moreover, because suit was filed several months before Edwards' passing, it cannot be prejudice resulting from the delay.

In addition, several other witnesses who could have shed light on the Sword's provenance were neither called nor deposed in the case. These included George Lower and Dennis Lowe, who acquired the Sword from Grossman, and Samuel Hough, who was present when Stanley discovered the Sword missing. Tharpe testified that he knew both Lower and Lowe, but called neither as a witness. Hough had retired from Brown but there was no proffer that he was unavailable as a witness, or that his memory would have been any less clear than his former co-worker and contemporary, Stanley. In fact, Stanley testified to a recent conversation with Hough

who is now a rare-books dealer. Under such circumstances Tharpe has failed to demonstrate that lack of witnesses or evidence resulting from Brown's delay in filing suit prejudiced his defense.

### III.    CONCLUSION

For these reasons the Court FINDS that the Tiffany Sword presented to Col. Hawkins in May 1863 and conveyed to Brown as part of the Annmary Brown Memorial was stolen from the Memorial sometime before 1977. The thief could not convey good title to anyone, and as a result even Tharpe's good faith purchase for value from a later possessor could not establish title superior to Brown's. Accordingly, the Court GRANTS JUDGMENT IN DETINUE and ORDERS the Tiffany Sword and Ornamental Scabbard returned to Brown University as the lawful owner, and custodian of Col. Hawkins' legacy.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

June 4, 2013